(46 South. 211.)

No. 16,683.

BENNETT et al. v. SOUTHERN SCRAP MATERIAL CO.

(April 13, 1908.)

1. LANDLORD AND TENANT—DUTIES OF LESSOR —WARRANTIES.

The lessor of a building is bound to deliver the same in good condition and free of repairs, and warrants against all vices and defects which may prevent it from being used for the purposes of the lease.

2. SAME—ESSENTIAL DEFECTS.

A stipulation that the lessee shall make all necessary repairs, present and future, for the term of one year, does not dispense the lessor

from his obligation to deliver the building in a sound condition as to its structural parts, nor does it exclude the lessor's warranty against essential vices and defects.

3. SAME—NECESSARY REPAIRS—DUTY OF LESSEE.

Where a leased building collapsed during the term by reason of rotten supporting columns, the lessor has no claim for damages against the lessee on the latter's covenant to make necessary repairs; usual decay being excepted.

4. SAME—DAMAGES—RECOVERY BY LESSEE.

A lessee, who might have protected himself at small cost against the collapse of a building by temporary shoring, is not entitled to recover the consequential damages.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by C. S. Bennett and another against the Southern Scrap Material Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

Parkerson, Bruenn & Breazeale, for appellants. Abraham Goldberg, for appellee.

LAND, J. Plaintiffs sued the defendant, their former lessee, for $7,850 damages alleged to have been occasioned by the collapse of a leased building, due to the failure of the lessee to make necessary repairs as stipulated in the contract.

The defense was a general and special denial of the alleged obligation of the defendant to repair or reconstruct the rotten pillars, which were the cause of the collapse complained of by the plaintiffs; and the defendant also claimed damages in reconvention in the sum of $1,354 for the alleged failure of the plaintiffs, after notice, to prevent said collapse, and thereafter to put the leased premises in such condition that defendant could remove therefrom its stock and material.

There was judgment rejecting the demands of both parties, from which plaintiffs have appealed. Defendant has answered the appeal, praying that the judgment be reversed as to the reconventional demand, and that the same be allowed as prayed for in the original answer.

There is little or no dispute about the facts of the case, which may be briefly stated as follows:

The lease in question was made for one year from September 30, 1905, and contained the following clause:

"And, in further consideration of this lease, the lessees bind and obligate themselves to make all necessary repairs required at present, and which may be required during the term of this lease, at their own cost and charges, * * * and at the end of the lease to return, without any further notice, possession of said premises and appurtenances, by actual delivery of the keys to the lessor, in good condition, the usual decay and wear and tear only excepted."

The defendant had been in possession of the same premises for the preceding three years under a lease containing a similar stipulation as to repairs. The lease now in question was a renewal at a higher price for the term of one year. The premises were leased for the purposes of a junk business, and consisted of an old two-story brick building in front and a two-story wooden building in the rear. The latter was a post and girder structure intended for storage purposes, and was substantially constructed in the year 1894. The defendant used the ground floor for the storage of metallic scraps, and the upper floor for the storage of rags and paper. The junk below necessarily surrounded the six pillars or posts that supported the upper floor.

In April, 1906, the defendant, after moving the junk piled around some of the posts, discovered that they were rotten. Mr. Bennett, husband and agent of the owner, was informed by defendant's officers that the posts were rotten and that in their opinion the building would collapse when they moved the stuff away. On the same occasion they informed Mr. Bennett that they did not intend to renew the lease in question. Mr. Bennett, according to his own testimony, did not call upon the defendant to repair the pillars, and

took no steps whatever to prevent the threatened collapse of the building. In fact, he expressed indifference on the subject. It may be here noted that Mr. Bennett about the same time repaired the roof of the structure at his own expense. The building collapsed on September 9, 1906. All of the posts on the lower floor were found to be more or less affected with dry rot. The post which gave way was thus affected nearly its entire length. Another post was rotten for as much as six feet, and a third post was so rotten that it had crushed and settled for about two feet. The acting city engineer concludes his report as follows: ·

"The collapse was caused by dry rot affecting the lower posts, and the building would in all probability have fallen of its own weight within 18 months if the posts in question had not been renewed in the interval. A complete renovation of the building should have been made some time ago, as, judging from the sample of the posts· which I have in my possession, I would assume that the structure was liable to collapse at any time within the past year."

The building was condemned by the city authorities, and was demolished by the lessor. The collapse of the building might have been prevented for the time being by additional temporary props. There is no sufficient evidence to prove that the rotting of the posts was due to the piling of metallic junk around them.

The pillars were a structural part of the building, supporting as they did the upper floor, intended for the storage of heavy articles. For this upper floor the pillars served all the purposes of a foundation.

The question before the court is whether the lessee obligated himself to replace those pillars, which had been rendered useless by natural decay. Under the terms of both leases, the lessee was not bound to make good "usual decay and wear and tear." If the decay commenced under either lease, the defendant was not responsible for the consequences. If the decay antedated either lease, it constituted a vice or defect covered by the lessor's implied warranty. The Civil Code classes decay with unforeseen events. "The expenses of the repairs which unforeseen events or decay may render necessary must be supported by the lessor, though such repairs be of the nature of those which are usually done by the lessee." The lease excepts repairs "rendered necessary by fire or other casualty, not occasioned by lessee's fault or negligence." It also excepts "usual decay," and, as we have seen, the Code considers unforeseen events and decay as of the same nature. The lessor warrants against all the vices and defects of the thing which may prevent its being used for the purposes of the lease, even in case he knew nothing of the existence of such vices and defects at the time the lease was made, and even if they have arisen since, provided that they do not arise from the fault of the lessee. Rev. Civ. Code, art. 2695. The thing leased must be delivered in good condition and free from any repairs. Rev. Civ. Code, art. 2693. Here the law draws a distinction between the condition of the thing and necessary repairs. In other words, the thing leased must have no vices and defects which render it unfit for the purposes of the lease, and in the next place must be in proper repair. Hence we conclude that the term "necessary repairs," as used in the lease in question, do not apply to vices and defects of condition which may prevent the leased premises from being used as intended by the parties. The defect in question rendered the building not only unfit, but unsafe. The question is one of the intention of the parties, and our conclusion is strengthened by the fact that the lessor recognized that it was her duty to repair the roof, and, when informed of the rotten condition of the posts, did not even intimate that it was incumbent on the lessee to repair or replace them. It is unreasonable to presume that the parties ever contemplated that the lessee for one year should

make good the ravages of decay in the structural parts of the building.

The cases cited, to the effect that the tenant must use the property so as not to destroy it, have no application. In Druhan v. Adam, 9 La. Ann. 527, the tenant overloaded an upper floor with grain, and, although he perceived that the joists of the second story were cracking and bending, neither diminished the weight nor supported the floor by temporary props or girders. In the case at bar there is no pretense that the upper floor was overloaded, and it is not proven that the collapse was caused by any negligent act of the tenant. The building stood nearly five months after the owner was notified of its condition.

The judge a quo found from the testimony that the columns had been in a state of decay for some time prior to the date of the lease, and held that such vice or defect was warranted against by the lessors.

The judge a quo rejected the reconventional demand, on the ground that the defendant could have avoided the damages by shoring the building, after it was made evident that the lessor did not intend to do anything to prevent its threatened collapse. We concur in this view.

Judgment affirmed.