AYRES, Judge.
Plaintiffs, husband and wife, operators of a service station, seek to recover of the defendants, Gulf Oil Corporation, hereinafter referred to as “Gulf,” and T.. P. McDaniel, a distributor of Gulf petroleum products, losses allegedly due to leakage of gasoline, over a period of time extending from January 1, 1959, to October 19, 1961, from an underground tank owned by Gulf and installed at plaintiffs’ service station.
, Although denying liability, defendant Gulf caused its distributor to be made a third-party defendant, against whom it sought judgment in the event it was condemned for any amount. McDaniel denied liability for plaintiffs’ losses, as well as for Gulf’s claims against him, on a basis that he had no responsibility in the maintenance or repair of the tank from which these losses allegedly resulted.
The defense urged by McDaniel was sustained and, accordingly, plaintiffs’ demands as well as those of Gulf, as a third-party plaintiff, were rejected. There was judgment, however, in favor of plaintiffs against Gulf for the sum of $8,785.90, with legal interest from judicial demand, and costs. From the judgment, Gulf appealed.
The appellant, Gulf, seeks, on this appeal, a reversal of the judgment and a rejection of plaintiffs’ demands for the reasons that, if it is found that a “Memorandum of Agreement” dated December 24, 1958, is the only contract existing between the Machens and Gulf, then it should be found that (1), under the only contract between plaintiffs and Gulf, Gulf was under no obligation and had no duty whatsoever to maintain the underground storage tank in which gasoline was stored; (2) in the alternative, and in the event it should be held to have had an obligation to repair the tank, it was not placed in default; (3) plaintiffs failed to establish the extent of their losses; and (4), moreover, plaintiffs failed to take any action to prevent or minimize their losses.
Again, Gulf, in the event it should be condemned, seeks judgment over against the third-party defendant, McDaniel.
The factual basis of this cause of action, about which little, if any, controversy exists, may be first briefly reviewed.
The tract of land upon which the service station was subsequently constructed was originally owned by one Clyde F. Swanson who, on May 10, 1941, for a term of 10 years beginning December 24, 1941, leased it to Gulf with an option to extend the term of the lease for two addi- *552 tíonal periods of five years each. Subject to this lease, Swanson, on January 28, 1944, sold the property to Elbert C. Machen, who has continued to own it ever since. The lease was extended in accordance with the option, and, under date of June 27, 1958, Gulf assigned it to McDaniel, its distributor.
Pursuant to the terms of the lease, Gulf proceeded, immediately after its execution, to erect a service station on the property, which construction included the installation of the required equipment, such as underground storage tanks and gasoline pumps. The date of the completion of these improvements determined the effective date of the lease, the term of which was, however, never formally extended beyond the limitation of time specified in the aforesaid option, that is, December 24, 1961. But, in the absence of a written extension of the lease, by virtue of the language employed therein, a holding over constituted a renewal or extension of the lease from month to month.
Gulf, as the owner of the equipment, including the underground tanks, in the instrument dated December 24, 1958, denominated, a “Memorandum of Agreement” but which was recited to contain a full and complete agreement between the parties, leased or “loaned” the aforesaid filling station equipment to plaintiff Machen. In this agreement it was recited that title to the equipment leased would remain in Gulf and be used only in connection with the storage and sale of products purchased from Gulf.
A primary contention of Gulf on the question of liability is that it had been released by Machen. The instrument relied upon, dated June 27, 1958, was executed by Machen simultaneously with an assignment by Gulf to McDaniel of the original lease of Swanson to Gulf. Machen, the owner of the premises in 1958, did, in that instrument, under a designation as lessor, consent to the assignment and did release Gulf “from its obligations under the terms and provisions of said lease agreement and relieve it from any further liability arising out of or in connection with the said lease agreement.” (Emphasis supplied.) Clearly, the release referred to Gulf’s liability under the original lease of the premises granted, as aforesaid, by Swanson. The status of the lease, after its assignment to McDaniel, was a matter no longer of concern to Gulf. Machen, owner of the premises, continued, however, to operate the station and to sell petroleum products obtained from McDaniel, Gulf’s distributor.
The only contractual relationship existing between Gulf and Machen during the period of the alleged losses, as pointed out by appellant’s counsel, was the “Memorandum of Agreement” dated December 24, 1958. Obviously, a release from obligations contracted in a prior instrument does not extend to obligations subsequently incurred in other contracts in the absence of clear and unmistakable language to that effect, and there is no such language in the act relied upon. The effect of the instrument of June 27, 1958, with reference to a release from obligations contained in the original lease agreement, does not extend to obligations created in the “Memorandum of Agreement” executed December 24, 1958.
Recovery for the losses sustained is sought on the basis of the language of LSA-C.C. Art. 2695 wherein it is provided:
“The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.”
The losses allegedly resulted from the escape of gasoline through a l/16"~l/8" *553 oblong hole in one of the underground tanks located 18-20" from the top of the tank, occurring while the aforesaid “Memorandum of Agreement” was in effect.
Contending that the recited codal provision has no application to the instant case, defendant, Gulf, relies upon and stresses certain provisions of the “Memorandum of Agreement” wherein Gulf is referred to as the party of the first part and Machen as the party of the second part, and wherein it is stated:
“Fourth: Said party of the second part shall at his own cost and expense, maintain said equipment in good condition and repair so long as he shall continue to use the same. In case said equipment is injured or destroyed while in his possession under this lease, or before it has been returned to the party of the first part, as herein provided, said second party agrees to pay to said first party the reasonable cost of repairing said equipment, or in case of its destruction, the full value thereof in cash.”
******
“Sixth: Said party of the second part shall indemnify and save harmless the party of the first part of and from any and all liability for loss, damage, injury or other casualty to persons or property, caused or occasioned by any leakage, fire or explosion of petroleum products stored in or dispensed from said equipment, or in any way growing out of or resulting from the installation and operation of said equipment, whether the same results from negligence or otherwise.”
With reference to the first of the aforesaid sections of the agreement, while it must be conceded that Machen, lessee of the equipment, under the aforesaid agreement, obligated himself to maintain the equipment in good condition and repair, the defense, nevertheless, is untenable, for “A mere reading of this provision convinces us that the repairs contemplated to be made by the lessee related to imperfections arising after the commencement of the lease, not to inherent structural vices.” Fazzio v. Riverside Realty Company, 232 La. 794, 95 So.2d 315, 320 (1957). See, also: Knapp v. Guerin, 144 La. 754, 81 So. 302 (1919); Bennett v. Southern Scrap Material Co., 121 La. 204, 46 So. 211 (1908); Pierce v. Hedden, 105 La. 294, 29 So. 734 (1901).
Moreover, a lessor is bound to deliver the thing leased in good condition and free from any repairs. LSA-C.C. Art. 2693. Accordingly, it has been held that, where a lease provided that lessees were to maintain a leased building in good condition and to make all repairs that became necessary, at their own expense, the lessor was not relieved of his obligation, under this provision of the Code, to deliver the thing in good condition and free from any repairs. Barrow v. Culver Bros. Garage, 78 So.2d 69, La.App., 2d Cir. 1955.
Moreover, by the actions of the parties they have so interpreted the agreement themselves. For instance, the rotary lift was defective. Gulf replaced it at its expense. The tank herein involved was likewise replaced by Gulf at its expense. No contention is made that Machen, lessee of the equipment, should have replaced the lift or the tank at his expense or that he should have reimbursed such expenses incurred by Gulf.
The defense predicated upon the second of the aforesaid quoted provisions of the agreement is likewise untenable as that provision concerns Gulf’s public liability for personal injuries and property damage which might be occasioned others. The provision obviously has no application to lessees’ loss of gasoline stored in defendant’s tanks, but the provision relates, as aforesaid, to such “loss, damage, injury or other casualty to persons or property, caused or occasioned by any leakage, fire or explosion of petroleum products stored in or dispensed from said equipment, or in any way growing out of or resulting from the installation and operation of said equip *554 ment, whether the same results from negligence or otherwise.” (Emphasis supplied.) Under this provision, should injury to persons or damage to property have been occasioned or caused by the perils enumerated, Machen, the lessee, would have been obligated to indemnify or to hold Gulf harmless.
Insofar as the second specification of error is concerned, we find no sound basis for the contention that Gulf was not placed in default. Plaintiffs testified they discussed the matter of their losses with Gulf’s employees as well as with McDaniel’s employees. Kenneth Slay, the truck driver for McDaniel, testified that he received a complaint, first in the early part of 1959, and numerous complaints thereafter, of the apparent shortages of gasoline. This information, he conveyed to McDaniel’s office. Moreover, it is shown that, when plaintiffs’ complaints reached McDaniel’s office, reports were made to Gulf- and that Gulf’s representatives or employees always gave immediate attention to these complaints. In fact, two of Gulf’s employees engaged as pump repairmen, although denying they themselves had received any complaints, testified they had been directed to run pressure tests and to check the gasoline pumps for possible leaks, and for that purpose they had made several trips to plaintiffs’ station. Shortly before the defect in the tank was discovered, one of these employees was directed to check one of plaintiffs’ pumps to ascertain why it was losing its prime. On discovering a hole in the suction line from the underground tank, this employee remarked, “Here is your leak.”
From the record, the conclusion is inescapable that Gulf had notice of complaints that defects existed in its equipment and, moreover, had made inspections to determine such defects, but without success.
Thirdly, we not only fail to find manifest error in the conclusions reached by the trial court on the question of the extent of plaintiffs’ losses but, after careful review of the record, we have also concluded that the record amply supports the judgment appealed. The learned and esteemed trial judge was thorough in his review of the evidence. In his written reasons for judgment it was pointed out that
“Plaintiffs offered in evidence their ledger books which showed the meter readings on each of their gasoline pumps from the period January 1, 1959, through October 19, 1961. Plaintiffs stated that they did not have any records before January 1, 1959. The Court is impressed with the accuracy of the records kept by the plaintiffs with some exceptions which will be discussed later. Initially, plaintiff claimed that during the period January 1, 1959, through October 10, 1961, they sustained losses of 80,785 gallons of Good Gulf gasoline. They admitted that the normal evaporation loss would be one-half of one per cent which left a net loss of 80,381 gallons to which they assigned 'a cost price of 25.9 cents per gallon.
“Prior to trial, however, they had Mr. Robert M. Cherry, an accountant in Winnfield who kept their books, go over their records and Mr. Cherry came up with a revised figure of a loss of only 65,835 gallons of Good Gulf gasoline. Prior to the trial Gulf had Mr. Paul H. Fellers, a senior sales representative in their office, go over the books in detail and make a reconciliation and Mr. Fellers came up with a maximum loss of 43,839 gallons which amount counsel for plaintiff now seeks. Thus plaintiffs in effect have reduced the amount of their claim to 43,839 gallons at the price of 25.9 cents per gallon or a total of $11,354.-30. After examining the various reconciliations and records of plaintiffs and the invoices filed in the record by Gulf, the Court will accept and use, with modifications, the recapitulation made by Mr. Fellers who testified on behalf of the defendant Gulf. Taking *555 his recapitulation we find that plaintiff purchased 204,200 gallons of Good Gulf gasoline in 1959 and sold, according to their records, 190,687.6 gallons which would indicate a loss of 13,512.4 gallons for 1959. Reference is made to the fact that from January 1 to January 10, 1959, the sales of gasoline were very light but adverse weather conditions could easily have accounted for that and the Court accepts the figures as given by Mr. Fellers in Gulf Exhibit No. 27, for this period.
“In 1960, Machen purchased 196,800 gallons of Good Gulf gasoline and according to his records sold 168,705.6 gallons. However, during the period November 29 through December 31, 1960, the plaintiffs’ records do not disclose any meter readings and the great disparity in the amount of gasoline bought and sold indicates that the figures could not be correct. The Court will, therefore, disregard the figures for the period November 29 through December 31, 1960, and will use only the purchases and sales during the period January 1 through November 29, 1960. During this period plaintiff purchased 177,400 gallons of Good Gulf gasoline and sold 163,634.7 gallons, leaving a net loss of 13,765.3 gallons.
“In 1961, the readings indicating the sales of Good Gulf gasoline are not available for the period January 1 through March 17. In addition, during this time at least one or more of the pumps were changed and new pumps installed and neither the last reading on the old pump nor the beginning reading on the new pump was available. Therefore, the Court feels that both the purchases and sales for this period must be eliminated, since plaintiff has failed to meet the burden of proof in showing their losses. During the period March 17 through October 19, 1961, plaintiff purchased 117,300 gallons of Good Gulf gasoline and sold 110,484.9 gallons, leaving a net loss of 6,815.1 gallons.
“To recapitulate, the Court feels that the plaintiff has proved losses of Good Gulf gasoline in the amount of 13,-512.4 gallons in 1959, 13,765.3 gallons for the period January 1, 1960, through November 29, 1960, and 6,815.1 gallons during the period March 17 through October 19, 1961, their total loss amounting to 34,092.8 gallons of Good Gulf gasoline. Plaintiffs concede that the normal evaporation loss would be one-half of one per cent. Deducting this amount, there remains a net loss of 33,922.4 gallons of Good Gulf gasoline which the Court feels is directly attributable to the defective gasoline tank. The price for Good Gulf gasoline was 25.9 cents per gallon and this would entitle the plaintiffs to recover the sum of $8,785.90 from Gulf Oil Corporation.”
Nevertheless, defendant complains that plaintiffs have not established, 'the extent of their losses to a legal certainty as would support the judgment. The basis of this complaint is that during the period of time within which plaintiffs sustained losses there were intervals when plaintiffs’ books and records were insufficient to establish such losses. This situation was taken into account and those intervals were eliminated from the calculation of plaintiffs’ losses. This fact should have no effect on plaintiffs’ recovery for the periods in which the records and proof offered adequately established the losses sustained.
The record likewise fails' to establish any basis for the fourth contention, the contention that plaintiffs failed, as reasonable and prudent operators, to prevent or minimize their losses. As heretofore pointed out, they notified Gulf’s distributor and his employees, to whom they made many complaints and requests for inspections of the equipment and for corrections to eliminate the losses which they were sustaining. The distributor in turn notified Gulf of plaintiffs’ complaints, whereupon Gulf dis *556 patched its experts to plaintiffs station. Inspection by these experts failed to reveal the cause of the losses of which plaintiffs complained until a pool of gasoline was finally discovered beneath the surface, when it was necessary to replace a car lift. A more thorough search followed, whereupon the cause of the leakage was revealed. Inasmuch as defendant’s experts were unable, through inspections specially made for the purpose, to discover defects in the equipment, if any existed, no basis exists for concluding that plaintiffs, non-experts, should or could have done better.
Gulf’s demand for judgment over against McDaniel is predicated on a proposition that if McDaniel had information as to the alleged losses and failed or neglected to advise Gulf thereof, then McDaniel should respond to' Gulf in whatever sum Gulf might be condemned. The proof is inadequate to support this claim, for, as heretofore observed, whatever information or complaints reached McDaniel were transmitted to Gulf. Moreover, Gulf’s liability is not predicated upon any failure of McDaniel to notify Gulf. McDaniel had no responsibility with respect to the underground tanks; no contractual relationship between him and Gulf existed with reference to these tanks.
Accordingly, the judgment appealed is affirmed at defendant-appellant’s cost.
Affirmed.